UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CASE NO. 22-cr-089 ZMF |
| v. : | |
| : | |
| NANCY BARRON, : | |
| : | |
| Defendant. : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO CHANGE VENUE TO INDIANA

Nancy Barron, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to another district (the Southern District of Indiana). The defendant fails to establish that she "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny her motion.

**FACTUAL BACKGROUND**

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the United States Capitol building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with then-Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.

Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows. Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the

1

President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

At 2:38 p.m., the defendant entered the Capitol through the Columbus Doors outside the Rotunda on the East Front. As encapsulated in the Statement of Facts accompanying the defendant's criminal complaint, the defendant is alleged to have entered the United States Capitol, just minutes following the recess of the House. Even before entry into the building the defendant moved past a line of bicycle racks, past several lines of officers, and pushed through a crowd of her fellow rioters. But once inside the Capitol, in a selfie-style video posted to Facebook, the defendant stated, with apparent jubilation, that she "made it in."

The defendant moved throughout the Capitol, speaking to others about the members of Congress. For example, she moved through the Rotunda occasionally stating, "where is fuckin' Pelosi . . ." and "is this Pelosi's stuff down here?" Eventually, the defendant made it to a hallway immediately outside the House Chamber and yelled, "fuck Nancy Pelosi and fuck Chuck Schumer! Got to drag those cocksuckers down!" At all times when the defendant was inside of the Capitol, then-Vice President Mike Pence was also within that restricted area.

As a result of the actions of the defendant and hundreds of others, on January 6, 2021, Congress was forced to halt its proceedings and evacuate the House and Senate Chambers. After the building was secured later that day, Congress reconvened and completed counting, certifying, and declaring the Electoral College vote result.

## **ARGUMENT**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the

crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

I. **The Impact of January 6 on Washington D.C. Does Not Support a Presumption of Prejudice.**

First, the defendant wrongly contends that a D.C. jury could not be impartial because of the disruption to the lives of the residents in the aftermath surrounding January 6. *See* Mtn. at 7. But January 6 is now more than two years in the past. Many D.C. residents do not live or work near the Capitol. There is no reason to believe that the District's entire population of 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely concluded that defendants can receive a fair trial in the location

where they committed their crimes, despite the fact that some members of the community were victimized. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon). In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.*

In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors. There is no reason to presume prejudice.[1] The government is unaware of any other change of venue motion that has been granted in the January 6 context. *See United States v Oliveras*, No. 21-cr-738-BAH, 2023 WL 196679, at *3 (D.D.C. Jan. 17, 2023) (collecting cases). Additionally, this district has had little difficult qualifying jurors to empanel juries in January 6 cases. Transfer is the exception, not the rule, even in the most politically-charged and widely-reported cases. In *United States v Garcia*, No 21-cr-

---

[1] Defendant's argument regarding the impact of the January 6 Riot on the District of Columbia suggests that no impartial jury can be seated in this District in any January 6 case, which itself undermines any argument that Defendant's case is singular or that he faces "extreme circumstances." Further, any such argument is contradicted by parallel January 6 proceedings in this District. As of this writing, multiple juries have been seated in this District in January 6 cases following thorough voir dire. And every judge in this District to address a motion to transfer venue in a January 6 case thus far has denied that motion. *See, e.g.*, *United States v. Brooks*, No. 21-cr-503-RCL (D.D.C. Jan. 24, 2022); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022); *United States v. Fitzsimons*, No. 21-cr-158 (RC) (D.D.C. Dec. 14, 2021) (Minute Order); *United States v. Reffitt*, No. 21-cr-32 (DLF) (D.D.C. Oct. 15, 2021) (Minute Order); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (APM) (D.D.C. Sept. 14, 2021).

4

129-ABJ, 2022 WL 2904352, (D.D.C. July 22, 2022), Judge Beryl A. Howell noted: "To date, courts have had little difficult qualifying enough jurors to empanel juries, with the requisite number of alternates, in January 6 cases." *Garcia*, at *10. Even in cases with more publicity than this defendant's case, there was little difficulty in empaneling a jury. *See United States v Rhodes et al*, No. 22-cr-015-APM, Minute Entry October 3, 2022, (empaneling jury in seditious conspiracy case against "Oathkeepers" militia).

**II.     The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

The defendant next contends that prejudice should be presumed based on pretrial publicity, without waiting for the Court to determine during voir dire whether an impartial jury can be selected. *See* Mtn. at 8. But, "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v.*

*Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to Defendant's contention, those factors do not support a presumption of prejudice in this case.

A. Size and characteristics of the community

Defendant suggests that an impartial jury cannot be found in Washington, D.C., despite the District's population of approximately 700,000. Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont); a larger population than each of the Article IV courts in Guam, Northern Mariana Islands, and the U.S. Virgin Islands; and more than four times as many people as the parish in *Rideau*.

The relevant question is not whether the District of Columbia is as populous as the Southern

7

District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected. And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of more than half a million, "12 impartial individuals could not be empaneled." *Id.*

### B.    Nature of the pretrial publicity

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. In fact, the only information regarding the defendant's case that the government has been able to discover is reported near the Southern District of Indiana.[2] Although our local news has covered January 6 as a whole, the defendant is not featured in any local, or national, outlet.

Even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*, 559 F.2d at 61. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 1,000 people. The Court can

---

[2] *See* "SE Indiana woman surrenders to face Capitol riot charges," March 15, 2022, WHAS11 (television news in Louisville, Kentucky); "Indiana woman charged in connection with U.S. Capitol riot," March 15, 2022, Indianapolis Star (Newspaper located in Indianapolis, Indiana); "Southern Indiana woman faces federal charges for role in Jan. 6 Capitol riot," WTHR (Television news in Indianapolis, Indiana); "SE Indiana woman surrenders to face Capitol riot charges," March 16, 2022, Indiana Public Media; "Patriot, Indiana, woman arrested in Capitol riot," March 15, 2022, WISH-TV (Television news in Indianapolis, Indiana); "Switzerland County woman charged for alleged role in Jan. 6 Capitol riot," March 16, 2022, WKRC (Television news in Cincinnati, Ohio)

guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt. The Court can best assess during voir dire whether specific media coverage of Defendant has possibly impacted the jury.

In any event, any threat of such spillover prejudice is not limited to Washington, D.C. Much of the news coverage of January 6 has been national in scope. There is, accordingly, no sound reason to believe that a jury pool in the defendant's home district would be substantially less likely to be aware of those news stories. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *see also United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)). Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

C. **Passage of time before trial**

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, 31 months have already elapsed since the events of January 6. This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. Moreover, much of the reporting has been national is scope, rather than limited to Washington, D.C., and none, to our knowledge, has focused on the defendant since

9

March 2022.

### D. The jury verdict

Because the defendant has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice. In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

## III. Convenience Does Not Justify a Change of Venue.

Defendant mentions a change of venue would be "a convenient forum since Barron resides in the District of Indiana. Witnesses for Barron's defense also reside in the District of Indiana." Mtn. 15. Conclusory references aside, the defendant makes no attempt to show any basis for a change of venue based on the "convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). Nor could Defendant make such a showing if she tried.

A change of venue would unquestionably not be convenient to for the government or its witnesses, the majority of whom are located in or near this district. Only the defendant herself would experience the convenience. Her attorney, the government's attorneys, and the government's witnesses (with exception to the case agent), would all be *inconvenienced* by the transfer. The defendant has pointed to no other instance in which this or any other Court has ordered a change of venue for convenience based on that consideration alone.

**CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

                          Respectfully submitted,

                          MATTHEW M. GRAVES
                          United States Attorney
                          D.C. Bar No. 481052

By:    /s/ *Adam M. Dreher*

                          ADAM M. DREHER
                          Assistant United States Attorney
                          Michigan Bar No. P79246
                          601 D. St. N.W.
                          Washington, D.C. 20530
                          (202) 252-1706
                          adam.dreher@usdoj.gov

                          VICTORIA A. SHEETS
                          Assistant United States Attorney
                          New York Bar No. 5548623
                          victoria.sheets@usdoj.gov